Kiker, Appellant, *v.* Philadelphia et al.

Argued January 28, 1943. Before MAXEY, C. J.; DREW, LINN, PATTERSON, PARKER and STEARNE, JJ. (STERN, J., absent.)

*George P. Williams, Jr.,* and *Louis B. LeDuc,* with them *Orr, Hall & Williams* and *Ralph W. Wescott,* for appellant.

*Abraham Wernick* and *Abraham L. Shapiro,* Assistant City Solicitors, with them *Ernest Lowengrund,* Acting City Solicitor, for appellees.

OPINION BY MR. JUSTICE DREW, March 29, 1943:

This suit in equity was instituted by Howard Kiker, a resident of the State of New Jersey, to restrain the enforcement of the provisions of an ordinance of the City of Philadelphia, approved December 13, 1939, which imposes a tax of one and one-half per centum annually on, inter alia, salaries, wages, commissions and other compensation. for work done or services performed in that City, as against any such income received by him after December 31, 1940, from employment by the United States government at the Philadelphia Navy Yard, a Federal area on League Island. Defendants, the City of Philadelphia and its officials, filed preliminary objections to the bill, assigning as one of the reasons therefor that no cause of action was stated, and, after argument and stipulation of counsel that the case be disposed of finally on the undisputed facts and upon questions of law, the learned court below entered a final decree sustaining the objections raised and dismissing the bill. The plaintiff then appealed to this Court.[1]

In his bill, plaintiff alleged that he is a resident of Mt. Ephraim of the State of New Jersey and that he has been employed for the past sixteen years at the League Island Navy Yard as a supervisor, planner and estimater in its industrial department. The bill prays that the City and its officials be prevented from enforcing the ordinance for the following reasons; that it is an attempt to impose a tax upon compensation for services of non-residents rendered outside of the City, that it is an attempt to impose a tax on persons who receive no

---

[1] Although the record here before us is silent as to the amount involved, the court below has filed a certificate, in compliance with Rule 52 of this Court, that the amount in controversy exceeds the sum of $2500.

protection or benefit from the City, and that it is an attempt to impose a tax on plaintiff's employment by the Federal government.

League Island lies on the westerly bank of the Delaware River, just above the mouth of the Schuylkill, and originally was a part of the City of Philadelphia. The Commonwealth of Pennsylvania, by the Acts of March 29, 1827, P. L. 153; February 10, 1863, P. L. 24; and April 4, 1866, P. L. 96, granted consent to the United States government, inter alia, to purchase and acquire, for naval and other purposes, a tract of land in the City and County of Philadelphia, known as League Island; and also ceded to the Federal government the right to exclusive jurisdiction thereover, providing, however, "That the cession . . . made shall continue in force so long as the . . . territory shall be used by the government of the United States for the purposes of a navy yard, and no longer: *And provided, also,* That all process, civil and criminal, of the commonwealth of Pennsylvania, shall extend into, and be effectual, within the territory hereby ceded, as if this law had not passed." Pursuant to appropriate federal legislation, approved February 18, 1867, 14 U. S. St. at L., c. 46, p. 396, a Certificate of Acceptance of this tract in the City and County of Philadelphia, dated December 23, 1868, was recorded in the office of the Recorder of Deeds in Philadelphia County in Volume 19 (J. T. O. 2) Miscellaneous Land Records p. 208. See *Manlove v. McDermott,* 104 Pa. Superior Ct. 560. On October 9, 1940, Congress passed Public Act No. 819 (54 Stat. 1059, 4 U. S. C. A. Section 14), providing by section 2,[2] that persons living or

---

[2] This section provides: "(a) No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area

receiving income in a Federal area should not be relieved from liability to pay any income tax levied by any State or any duly constituted State taxing authority having jurisdiction to levy such a tax by reason of residence or employment in the Federal area.

Three questions are presented for our determination: first, whether Congress was acting within its constitutional limits in attempting by Public Act No. 819 to confer upon the Commonwealth of Pennsylvania and its political subdivisions the power to tax incomes earned within a Federal area; second, whether by the terms of that statute Congress did permit the City of Philadelphia to levy the tax in question; and, third, whether the Philadelphia ordinance imposing the tax may be so construed as to embrace the Federal area of League Island. These questions have never been passed upon by us, nor, so far as our research reveals, by any other appellate court. We shall consider them in the order stated.

It is clear that since this Commonwealth granted to the United States government exclusive jurisdiction, without qualification or restriction, save as to the service of criminal and civil process and as to limitation upon the duration of the cession, the City of Philadelphia could not lawfully impose a tax upon income received by a non-resident from transactions occurring or services performed in the Federal area of League Island (*Standard Oil Co. v. California,* 291 U.S. 242), unless, of course, Congress can grant such consent. See *United States v. City of Buffalo,* 54 F. (2d) 471. It was originally supposed that a State, in granting consent to the Federal government to purchase territory upon which to erect forts, magazines, arsenals, dock-yards and other needful buildings, could not constitutionally qualify its consent, and that jurisdiction, under such circumstances, had to be exclusively in the United States government, on ac-

was not a Federal area. (b) The provisions of subsection (a) shall be applicable only with respect to income or receipts received after December 31, 1940."

count of the provisions of Article I, Section 8, Clause 17 of the Constitution of the United States:[3] *United States v. Cornell,* 2 Mason's Reports (U.S.C.C.) 60; *Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525. However, it is now well settled that in granting consent to the Federal government a State can reserve to itself such jurisdiction (e.g. the right to impose taxes in the area in question) as will not interfere with the enjoyment by the government of the United States of the property for the uses and purposes for which it was obtained: *James v. Dravo Contracting Co.,* 302 U.S. 134. In the latter case, a suit was brought by a contracting company to restrain the collection of a tax imposed by the State of West Virginia on gross receipts obtained by it under contracts with the National government. It was held that the tax was applicable to receipts obtained under contracts performed by a Pennsylvania corporation upon lands purchased by the government of the United States for use in connection with the erection of needful buildings (dams), for the reason that the consent of the State to purchase contained a reservation of its right to tax in such areas. There, the Supreme Court of the United States, speaking through its then Chief Justice, said (p. 146): ". . . it is urged that if the paragraph be construed as seeking to qualify the consent of the State, it must be treated as inoperative. That is, that the State cannot qualify its consent, which must be taken as carrying with it exclusive jurisdiction by virtue of Clause 17 [of Article I, Section 8 of the Federal Constitution] . . . [p. 148]. Normally, where gov-

---

[3] "The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

ernmental consent is essential, the consent may be granted upon terms appropriate to the subject and transgressing no constitutional limitation . . . Clause 17 contains no express stipulation that the consent of the State must be without reservations. We think that such a stipulation should not be implied. We are unable to reconcile such an implication with the freedom of the State and its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation. In the present case the reservation by West Virginia of concurrent jurisdiction did not operate to deprive the United States of the enjoyment of the property for the purposes for which it was acquired, and we are of the opinion that the reservation was applicable and effective." On the same day it was also said by that tribunal, in this connection, in *Mason Co. v. Tax Comm'n*, 302 U.S. 186, 207-8: "The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State *(Kohl v. United States, 91 U.S. 367, 371, 372)*, does not necessitate the assumption by the Government of the burdens incident to an exclusive jursidiction. We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority."

It follows, therefore, that the Commonwealth of Pennsylvania, when it consented to the purchase of League Island by the National government and ceded jurisdiction over it, could have reserved to itself the right to tax in such area, even though the territory was acquired for use as a dock-yard, just as a number of States have done under similar circumstances with

respect to land within their respective geographical limits.[4] There can be no logical objection on constitutional grounds if the same result is accomplished by a recession to the State of the right to tax, should Congress see fit by this means to promote local efficiency, as it appears to us to have done in passing Public Act No. 819. Similar retrocessions to the States of the Union are not unusual.[5] While any cession, or recession, of jurisdiction by one sovereignty to another requires an acceptance in order to render it effective *(Yellowstone Park Transp. Co. v. Gallatin County,* 31 F. (2d) 644); such acceptance will be presumed in the absence of a contrary intent *(Mason Co. v. Tax Comm'n,* supra). No such contrary intent appears anywhere in the record in the instant case. "The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, cooperatively adjust problems flowing from our dual system of government": *Collins v. Yosemite Park Co.,* 304 U.S. 518, 528.

Plaintiff contends that he receives no benefits or protection from the City of Philadelphia, and, therefore, that to enforce the provisions of the ordinance here under consideration upon him is to deprive him of his property without due process of law. With this contention we cannot agree. It is clear that in classifying persons for taxation an obligation on the part of the taxing power to make available some benefit to them

---

[4] California: Stat. 1919, c. 51, p. 74; Kansas: Laws of 1875, c. 66, p. 95; Nebraska: Laws of 1887, c. 83, p. 628, quoted in *County of Cherry v. Thacher,* 32 Nebr. 350; Washington: Session Laws of 1901, c. 92, p. 192; West Virginia: Code of 1937, c. 1, Art. 1, Sections 3, 4.

[5] 26 Stat. 842, Section 5 (1891) (receding to the State of Arkansas jurisdiction to tax as personal property all structures and other property in private ownership on the Hot Springs reservation; 30 Stat. 668 (1898) (jurisdiction receded to states over places purchased for branches of soldiers' homes); 53 Stat. 575 (1939) (Public Salary Tax Act).

must exist. We are satisfied, under the circumstances here presented, that such obligation does exist on the part of the City of Philadelphia for the benefit of the persons and property on League Island by reason of the recession by Congress to this Commonwealth of the power to tax in the area in question. A State may reserve to itself the power to tax in an area within its geographical limits when ceding jurisdiction to the National government over such territory. When the State does make such reservation in its act of cession, the obligation of furnishing protection and benefits to the persons and property within the confines of the ceded area impliedly remains in the State: *James v. Dravo Contracting Co.,* supra. In that case, it was said (p. 148):
". . . a transfer of legislative jurisdiction carries with it not only benefits, but obligations, and it may be highly desirable, in the interest both of the national government and of the State, that the latter should not be entirely ousted of its jurisdiction. The possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired." Therefore, there is no constitutional objection, in our opinion, to the Federal government's receding to a State a portion of the exclusive jurisdiction previously obtained from it, together with the incident obligations which were impliedly transfered by the recession. This Congress has done by Public Act No. 819. There is no doubt that after the cession, Philadelphia was obligated to confer all the usual attributes of government—the same as those possessed by residents and citizens of Philadelphia—upon those deriving income from working on League Island; fire and police protection, the right to use all municipal facilities, etc. This obligation can be called into play at any time the national government refuses or neglects to furnish them. This is certainly

true, as in *James v. Dravo Contracting Co.*, supra, where the State reserved the right to tax, and it must necessarily be so in the case where, as here, the right to tax has been placed in Philadelphia by the recession of the National government. Benefits are conferred upon the plaintiff, and this case is determined by the reasoning and decision in *James v. Dravo Contracting Co.*, supra. The fact that the Federal government, as far as League Island is concerned, does not at this time see fit to take full advantage of the obligation of this Commonwealth, or its political subdivision, the City of Philadelphia, to make available protection and benefits to persons and property on the Island, does not justify our invalidation of the income tax in question, as far as plaintiff and those in a similar position are concerned: *Union Transit Co. v. Kentucky*, 199 U. S. 194. The area in which plaintiff is employed or engaged is actually no longer an island, but is now physically a part of the mainland of this Commonwealth. The reservation is immediately adjacent to Philadelphia; is geographically within its limits; and since December 31, 1940, because of the provisions of Public Act No. 819, is actually part of that City for the purposes of imposing the tax here under consideration. Plaintiff may at all times use the streets, bridges and other facilities of the City, and also has the benefit of protection of its police and fire departments when engaging in business or pleasure in that municipality, as well as many other advantages. It is common knowledge that the City of Philadelphia cuts all ice, and keeps the Delaware River navigable from the northern limits of the City to Chester, where in the winter months navigation would otherwise be closed, making possible to plaintiff the transportation he uses to go to and return from League Island to his home in New Jersey. This is decidedly a benefit to him. These facts will be judicially noticed by the Court regardless of any allegations to the contrary contained in the bill: *Pearce v. Langfit*, 101 Pa. 507; *French v. Senate*,

146 Cal. 604, 80 P. 1031; *Ft. L. Rld. Co. v. Lowe*, 27 Kan. 749, affirmed 114 U. S. 525; 20 Am. Jur. p. 54. Therefore, we are convinced that the tax does not violate the Fourteenth Amendment of the Federal Constitution, that all the benefits of the facilities of Philadelphia are legally available to plaintiff, and he has no just reason to complain of the tax.

Plaintiff argues also that Congress is without power to waive a Federal employee's immunity or exemption from city and state taxes. With this argument we cannot agree, for it completely ignores the fact that such employee, prior to the decision in *Graves v. N. Y. ex rel. O'Keefe*, 306 U. S. 466, and the enactment of Public Salary Tax Act and Public Act No. 819, was merely the incidental beneficiary of an anomolous situation then supposed to exist between the State and Federal governments, which was founded on the theory that for either sovereignty to tax the employee of the other was in reality an unlawful interference with the activities of that government whose employee was taxed. Therefore, such employee obviously had no vested rights whatsoever in any immunity or exemption from taxation he may have been fortunate enough to enjoy previously; and for that reason his governmental employer can lawfully consent to remove such immunity or exemption in order effectually to correct this condition and thus make him contribute financial support to the other government whose benefits he shares. In the *O'Keefe* case it was said, with regard to this identical argument (pp. 483-4): "The ultimate repudiation in *Helvering v. Mountain Producers Corp.*, [303 U. S. 376], of the doctrine that a tax on the income of a lessee derived from a lease of government owned or controlled lands is a forbidden interference with the activities of the government concerned led to the reëxamination by this Court, in the *Gerhardt* case [*Helvering v. Gerhardt*, 304 U. S. 405], of the theory underlying the asserted immunity from taxation of one government of salaries of em-

ployees of the other. It was there pointed out that the implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted . . . It was further pointed out that, as applied to the taxation of salaries of the employees of one government, the purpose of the immunity was not to confer benefits on the employees by relieving them from contributing their share of the financial support of the other government, whose benefits they enjoy, or to give an advantage to a government by enabling it to engage employees at salaries lower than those paid for like services by other employers, public or private, but to prevent undue interference with the one government by imposing on it the tax burdens of the other." We accordingly conclude that Public Act No. 819 does not violate Clause 17 of Article I, Section 8, or the due process clause of the Fifth Amendment of the Federal Constitution.

We next turn to the second question, involving the construction of this Federal statute. As heretofore stated, no State may by taxation impose burdens upon the United States which interfere with the exercise of its governmental functions. In the *Dravo* case a State tax upon gross receipts paid by the United States to a non-resident contractor was held not to interfere in any substantial way with the performance of federal functions. The fact that the work was performed upon land over which the State had ceded its jurisdiction to the United States, save for the right to tax and to serve process, had no bearing on whether the tax constituted a prohibited burden. Of this case it was said in *Falls City Brewing Co. v. Reeves,* 40 Fed. Supp. 35, 39: "The Supreme Court opened the way for the application of certain nondiscriminatory State taxes on Federal areas, except insofar as those taxes might constitute a burden upon the United States, by its decisions in December 1937 in *James v. Dravo Contracting Co. . . . ,* and *Silas Mason Co. v. Tax Commission . . .*" Two

years after the decision in the *Dravo* case, the time-honored principle of *Collector v. Day,* 11 Wall. 113 and *Dobbins v. Erie County,* 16 Pet. 435, that a state tax on the salary or occupation of a Federal employee constituted a direct and therefore unconstitutional burden on the United States government, was overthrown by the highest Federal tribunal in the *O'Keefe* case, in which the New York State income tax was held valid as applied to an officer of a United States governmental agency residing in that State. See *Marson v. Philadelphia,* 342 Pa. 369. As a sequel to this decision respecting taxation of Federal officers and employees, Congress passed the Act of April 12, 1939, c. 59, Title I, Section 4 (53 Stat. 575, 5 U. S. C. A. Section 84a), called the Public Salary Tax Act, whereby employees of the United States government were rendered subject to taxation by the State within which they reside, regardless of whether or not their compensation was earned on a Federal reservation. As the result of this Statute, a State could tax its own residents for income earned on Federal property, and could tax non-residents and residents of a United States reservation for income earned within the State proper, but could not tax non-residents or residents of a Federal area for income earned within the Federal area. State taxation of persons employed on Federal territory thus lacked uniformity, the resident of the State being subjected to taxation, while the non-resident employee, such as plaintiff, and the resident of the Federal area escaped. There was likewise a lack of uniformity in State taxation of non-residents, other than Federal employees, where the particular State had not reserved in its consent the power to tax in the United States' territory, in that those who earned income on the reservation were immune or exempt from State taxation, while those working elsewhere in the State were subject to it. For the purpose of correcting these anomolous situations, it seems to us, and to enable State taxation to fall alike upon all who earned income in the

State within whose boundaries the reservation was located, and in recognition of the generosity of the States which had granted to the Federal government exclusive jurisdiction over land within their respective territorial limits without reserving the right of taxation, Congress, in the best interests of our dual form of government, enacted Public Act No. 819. That these were the reasons for the passage of this statute is substantiated by the Report of a subcommittee of the Committee on Finance of the United States Senate, wherein it was stated: "Section 2 (a) of the Committee amendment removes the exemption from income taxes levied by a State, or any duly constituted taxing authority in a State, where the exemption is based solely on the ground that the taxpayer resides within a Federal area or receives his income from transactions occurring or services performed in such area. One of the reasons for removing the above exemption is because of an inequity which has arisen under the Public Salary Tax Act of 1939. Under that act a State is permitted to tax the compensation of officers and employees of the United States when such officers and employees reside or are domiciled in that State but is not permitted to tax the compensation of such officers and employees who reside within Federal areas within such State. For example, a naval officer who is ordered to the Naval Academy for duty and is fortunate enough to have quarters assigned to him within the Naval Academy grounds is exempt from the Maryland income tax because the Naval Academy grounds are a Federal area over which the United States has exclusive jurisdiction, but his less fortunate colleague, who is also ordered there for duty and rents a home outside the Academy ground because no quarters are available inside, must pay the Maryland income tax on his Federal salary. Another reason for removing the above exemption is that under the doctrine laid down in *James v. Dravo Contracting Co.* (302 U. S. 134, 1937), a State may tax the income or receipts from transac-

tions occurring or services performed in an area within the State over which the United States and the State exercise concurrent jurisdiction but may not tax such income or receipts if the transactions occurred or the services were performed in an area within the State over which the United States has exclusive jurisdiction."

It is clear, therefore, from the obvious purposes of the Act, as indicated by its language and by the decisions and legislation which preceded it, corroborated by the views expressed by the Senatorial committee which considered it, that Congress intended it to apply to just such a situation as we have here before us. Plaintiff claims, however, that the phrase "having jurisdiction to levy such a tax" renders the Statute inapplicable to him because prior to its enactment the City of Philadelphia had no jurisdiction to impose taxes on League Island. Such a construction is the equivalent of saying that Congress merely intended to authorize the States to tax persons whom they were already permitted to tax. We cannot permit such an absurd construction to nullify this legislation. Cf. *Superior Bath Co. v. Mc-Carroll*, 312 U. S. 176, 178. The phrase in question is obviously descriptive of the language preceding it and refers to the *power* of the taxing authority to impose the type of tax mentioned; it does not refer to its jurisdiction over the territory.

Having determined that Public Act No. 819 permits this Commonwealth and its subdivisions to enact legislation taxing the incomes of persons engaged on Federal reservations lying within the State's territorial limits or boundaries, and that this statute as so construed does not violate the Constitution of the United States, we next pass to a consideration of the construction and applicability of the income tax ordinance of the City of Philadelphia. That ordinance, enacted on December 13, 1939, pursuant to permission of the legislature conferred upon that City by the Act of Assembly of August 5, 1932, P. L. 45 (Sterling Act), provided for a general non-

discriminatory tax, inter alia, on all incomes earned within that municipality. Although plaintiff's salary was at that time immune from this levy, when the immunity was removed by Public Act No. 819, which receded to Philadelphia jurisdiction to impose taxes on League Island, the ordinance became applicable there without further action by either the State legislature or city council. The language of the Superior Court in *Philadelphia v. Schaller,* 148 Pa. Superior Ct. 276, is particularly apposite here. There it was said (p. 282) : "When the disability of the State to tax federal incomes was removed, there was no need for a reenactment of the legislation to reach incomes formerly exempt; the powers originally granted, broad enough to include all income regardless of the source were sufficient for the purpose." Plaintiff argues that the phrase of the ordinance "in Philadelphia" excluded League Island because it is not within Philadelphia. This contention is without merit, for obviously that phrase was intended to mean within the geographical limits of that City. As is clearly shown by the Act of February 2, 1854[6] (incorporating the City) and the statutes granting consent to its purchase and ceding jurisdiction over League Island, as well as the Federal government's Certificate of Acceptance thereof, the reservation is within the City's territorial boundaries, and the area comprising the island is not, by the phrase "in Philadelphia" excluded from the rest of the City where the tax is clearly applicable. See *Rainier Nat. Park Co. v. Martin,* 18 Fed. Supp. 481, affirmed 302 U. S. 661; *Standard Oil Co. v. California,* supra, p. 243. The averments of plaintiff's bill that League Island is not a part of Philadelphia and that it is wholly outside the political jurisdiction and sovereignty of the Commonwealth of Pennsylvania are not allegations of fact, but rather conclusions of law, which need not be accepted as true by the Court in con-

---

[6] That statute shows League Island to be in the First Ward of the City of Philadelphia.

sidering the sufficiency of the bill: *Commonwealth ex rel. Davis v. Blume*, 307 Pa. 406.

We, conclude, after carefully considering all of the arguments advanced by plaintiff, that the Philadelphia income tax ordinance is applicable to him, and that, as so applied, it is not unconstitutional. The assignments of error are all overruled and, therefore, the decree of the court below must be affirmed.

Decree affirmed; costs to be paid by appellant.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I think this appellant, a resident of the State of New Jersey, employed on League Island, was justified in challenging the imposition of a tax on him by Philadelphia, for that city since 1868 when it ceded League Island to the Federal government with "exclusive jurisdiction" over it, has had *no* jurisdiction over that island or over any person or property on that island (except the right to serve process), and I would sustain appellant's challenge.

There are certain established principles of American constitutional government which rule the question raised in this case. They are as follows:

1. The root of the American system of government is found in the principle of duality of sovereignty: *Com. ex rel. McGlinn v. Smith*, 344 Pa. 41, 51. All courts agree as to the necessity of maintaining this duality.[1]

2. A state is without power to impose any taxes on persons or property or any piece of land it has owned but over which it ceded to the Federal government a grant of "exclusive jurisdiction": *Standard Oil Company v. California,* 291 U. S. 242, 244.

3. A State in ceding part of its territory to the Federal government *may* reserve "concurrent jurisdiction"

---

[1] No political dreamer was ever wild enough to think of breaking down the lines which separate the States and of compounding the American people into one common mass: *McCulloch v. Maryland*, 17 Wheat. 315, 402.

over the land so ceded. It may reserve merely the right to execute process within the limits of the land so ceded (as was done when it ceded League Island to the Federal government). Both these propositions under No. 3 are exemplified in *James v. Dravo Contracting Co.*, 302 U. S. 134.

4. "All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident": MARSHALL, C. J., in *McCulloch v. Maryland*, 17 Wheat. 315, 429. See also *Van Brochlin v. Tennessee*, 117 U. S. 151, 155.

5. The United States Supreme Court said: "We take it to be a point settled beyond all contradiction or question, that a State has jurisdiction of all persons and things within its territory which do not belong to some other jurisdiction . . .": *Coe v. Erroll*, 116 U. S. 517, 524.[2] It is a corrollary of this principle that a State has *no* jurisdiction over any person or thing over which another sovereign power has exclusive jurisdiction.

It is an undisputed fact that when Philadelphia ceded League Island to the Federal government, it reserved no jurisdiction to tax any person or any property on League Island. The question then comes down to this: Did Public Act of Congress No. 819 confer on Philadelphia the power to levy a tax on wages earned on

[2] In *Kirtland v. Hotchkiss*, 100 U. S. 491, the United States Supreme Court said (quoting from an earlier case) : " 'Unless restrained by provisions of the Federal Constitution, the power of the State as to the mode, form, and extent of taxation is unlimited, *where the subjects to which it applies* are within her jurisdiction.' (Italics supplied.) . . . We perceive no reason to modify the principles announced in these cases or to question their soundness. They are fundamental and vital in the relations which, under the Constitution, exist between the United States and the several States. Upon their strict observance depends, in no small degree, the harmonious and successful working of our complex system of government, Federal and State. . . ."

League Island by a person who was not a resident of Philadelphia or even of Pennsylvania, but who did reside in the State of New Jersey? The power to tax is an attribute of sovereignty, and if one sovereignty confers any part of its taxing power on another sovereignty it must do so in unequivocal language. The transfer of sovereign power is never made by mere *implication*.

Public Act No. 819 declares that "No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, *having jurisdiction to levy such a tax* [italics supplied], by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area."

To determine whether the wages of this plaintiff, a resident of New Jersey, can be taxed by Philadelphia by virtue of the Act, we must ascertain whether Philadelphia has "jurisdiction to levy such a tax", for *only in the event* that Philadelphia has such jurisdiction can it impose any liability on a non-resident of Philadelphia employed in the Federal area of League Island. It is clear to me that Philadelphia had no such jurisdiction when it enacted the income tax ordinance of December 13, 1939 "Imposing a tax for general revenue purposes on salaries, wages, commissions and other compensation earned after January 1, 1940 by . . . non-residents of Philadelphia for work done or services performed or rendered in Philadelphia, . . ." It did not have such jurisdiction at that date because Pennsylvania passed the Act of February 10, 1863, P. L. 24 "ceding to the United States of America the right of exclusive legislation over League Island" and providing in section 3 that upon acceptance by the United Staes "sovereignty and right to exclusive jurisdiction over all the said premises shall be vested in the United States of America."

The ordinance of Philadelphia under which the challenged tax was imposed provides in section 10 that it does not purport to apply to any "person as to whom or which it is beyond the legal power of council to impose the tax or duties herein provided for." In *Philadelphia v. Schaller*, 148 Pa. Superior Ct. 276, the Superior Court of Pennsylvania properly described League Island as being not in, but "near the City of Philadelphia." The supremacy of the United States over the land ceded (League Island) was also expressly recognized in *Manlove v. McDermott*, 104 Pa. Superior Ct. 560.

The term "jurisdiction" implies that the person or tribunal which has acquired it is thereby empowered to declare or establish an enforceable liability against the person or subject over which it has been acquired: *Santa Cruz Rock Pavement Co. v. Broderick*, 45 P. 863, 113 Cal. 628. "The word 'jurisdiction' as used in sec. 202 of the tax law, N. J. S. A. 54: 4-1, providing that 'all property, real and personal, within the jurisdiction of this state . . . shall be subject to taxation annually' means governmental jurisdiction, which is the equivalent of sovereignty": *Yardley v. Essex County Board of Taxation*, 108 A. 299, 300, 93 N. J. L. 290.

It must be presumed that when Congress enacted Public Act No. 819 it had precise knowledge of the meaning of the word "jurisdiction". It ill becomes us to say, as does the majority opinion, that when Congress used the word "jurisdiction" it meant "the power of the taxing authority to impose the type of tax mentioned". I think that if Congress intended to give States and political subdivisions of States the power to impose certain types of taxes on residents or workers in nearby Federal areas it would have plainly said so. The American Congress in drafting laws usually *says* what it means and *means* what it says.

We are not concerned in this case with what some subcommittee of some committee of the United States Senate said as to the purpose of Public Act No. 819. It is

well settled that declarations by *members* of a legislative body as to what *purpose* an act had carries no weight in the interpretation of that act. "No motive, purpose, or intent can be imputed to the legislature in the enactment of a law other than such as are apparent upon the face and to be gathered from the terms of the law itself. A secret intention of the lawmaking body cannot be legally interpreted into a statute which is plain and unambiguous, and which does not express or imply it. Seeking hidden meanings at variance with the language used is a perilous undertaking which is quite as apt to lead to an amendment of a law by judicial construction as it is to arrive at the actual thought in the legislative mind": 25 R. C. L. pp. 962, 963, sec. 217. "The intention of the legislature is to be obtained primarily from the language used in the statute. The court must impartially and without bias review the written words of the act, being aided in their interpretation by the canons of construction. Where the language of a statute is plain and unambiguous, there is no occasion for construction, even though other meanings could be found; and the court cannot indulge in speculation as to the probable or possible qualifications which might have been in the mind of the legislature, but the statute must be given effect according to its plain and obvious meaning, and cannot be extended beyond it because of some supposed policy of the law, or because the legislature did not use proper words to express its meaning, or the court would be assuming legislative authority": 59 C. J. pp. 952 et seq., §569. The interpretation the majority opinion puts on Public Act No. 819 leads, according to my view, to absurd consequences. For example, the District of Columbia is a Federal area, precisely as League Island is.[3]

---

[3] Public Act No. 819 in sec. 6 (e) says: "The term 'Federal area' means any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency of the United States; and any Federal area, or any part thereof, which is located within the exterior boundaries of any State shall be deemed to be a Federal area located within such State."

Under the interpretation put upon the Act by the majority opinion, a resident of the State of *Virginia* who earns a salary or wages in the *District of Columbia* could be taxed on that salary or wages by the State of *Maryland,* because the District of Columbia "is located within the exterior boundaries" of Maryland to which it belonged until Maryland ceded it to the United States, exactly as League Island is located within the exterior boundaries of Pennsylvania, to which it belonged until Pennsylvania ceded it to the United States.

Public Act No. 819 obviously means that if a resident of *Philadelphia* earns wages or a salary on League Island, Philadelphia can tax those wages or that salary without interference from the Federal government; it means that if a resident of League Island earns wages or a salary *in Philadelphia,* Philadelphia can tax those wages or that salary without Federal interference. In each of these instances Philadelphia has "jurisdiction" to levy the tax.

Public Act No. 819 was passed at a time when there was a change in the policy of the United States government as to permitting States to tax the salaries of Federal officials or employees and as to permitting the Federal government to tax the salaries of State officials or employees. This change of policy was revealed in the decision of the United States Supreme Court in *Graves v. New York ex rel. O'Keefe,* 306 U. S. 466, and the enactment of Public Salary Tax Act, i. e. the Act of April 12, 1939, c. 59, Title I, Sec. 4 (53 Stat. 575, 5 U. S. C. A. sec. 84a).

It may be that in enacting Public Act No. 819 Congress intended to make it crystal clear that when a State or a subdivision of a State *had jurisdiction* over the person *or* the property of an individual that person could not resist, with Federal support, the payment of a tax on his wages even though those wages were earned by him in a Federal area, or if he resided in a Federal area and earned wages in a State, that State or its appropri-

ate subdivision could tax those wages without Federal interference. The condition precedent to the taxation by the State or its subdivision of this individual or his wages and salary, was jurisdiction over either him *or* his wages and salary by the taxing authority. In Public Salary Tax Act, supra, the United States consented "to the taxation of compensation, received after December 31, 1938, for personal service as an officer or employees of the United States, any Territory or possession or political subdivision thereof, the District of Columbia, or any agency or instrumentality of any one or more of the foregoing, by any duly constituted taxing authority having jurisdiction to tax such compensation, if such taxation does not discriminate against such officer or employee because of the source of such compensation." The majority opinion concedes that "As the result of this Statute, a State could tax its own residents for income earned on Federal property, and could tax non-residents and residents of a United States reservation for income earned within the State proper, but could not tax non-residents or residents of a Federal area for income earned within the Federal area." It is significant that in essence the very phrase Congress incorporated in the Public Salary Tax Act, to-wit, "by any duly constituted taxing authority *having jurisdiction* to tax such compensation [italics supplied]", is also used in Public Act No. 819.

Both the Public Salary Tax Act and Public Act No. 819 make as a condition precedent to the action of any taxing authority to levy a tax, the possession by that authority of "jurisdiction to tax" of the person or thing specified. If, as conceded by the majority opinion, a non-resident of Philadelphia could not under the Public Salary Tax Act be taxed on his salary or wages earned in a Federal area, it is difficult to understand how Philadelphia can under Public Act No. 819 tax a non-resident's salary or wages earned on League Island. Under the Public Salary Tax Act, the United States "consents" to

the taxation of the compensation received for personal service by an officer or employee of the United States or by any of its political subdivisions or possessions, such as the District of Columbia or League Island, by any taxing authority having jurisdiction to tax such compensation. Under Public Act No. 819, the United States declares that "No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax." Under *either* Act the possession of jurisdiction to levy the tax on the person or thing involved must be present in the taxing authority, if the person or thing taxed is to be "relieved from liability" for it or if the United States "consents" to it. Congress never gave Philadelphia any jurisdiction to tax this New Jersey citizen or his earnings on a Federal Area and Pennsylvania never consented to such a transfer of a sovereign power to its municipal creature, the City of Philadelphia.

Philadelphia has no more authority to accept *without the express consent of the Commonwealth of Pennsylvania,* jurisdiction to tax wages earned by a non-resident of Philadelphia, on League Island, than it would have to accept, without the Commonwealth's consent, jurisdiction to indict, try and sentence a resident of League Island for a crime committed in that jurisdiction (which is a jurisdiction as foreign to Philadelphia as is New Jersey).[4] In *McCulloch v. Maryland,* supra, Chief Justice MARSHALL declared: "The sovereignty of a state extends to everything which exists by its own authority, or *is introduced by its permission".* (Italics supplied.)

---

[4] A State is without jurisdiction to punish offences committed in a ceded area. In *Commonwealth v. Clary,* 8 Mass. 72, it was held: "No offences committed within that [ceded] territory are committed against the laws of this Commonwealth; nor can such offences be punishable by the courts of this Commonwealth unless the Congress of the United States should give to the said courts jurisdiction thereof." See also *U. S. v. Travers,* Fed. Cas. 16537 and *Murray v. Gerrich,* 291 U. S. 315; *Bank of Phoebus v. Byrum,* 110 Va. 708.

In *Collins v. Yosemite Park & Curry Co.*, 304 U. S. 518, it was declared: "Jurisdiction obtained by consent or cession may be qualified by agreement [of a State and the National government] or through offer and acceptance or ratification. It is a matter of arrangement."

In the case now before us Congress never offered to cede to Philadelphia any part of the "exclusive jurisdiction" it obtained over League Island more than three-quarters of a century ago and Pennsylvania and Philadelphia never accepted any such offer. There has been no "arrangement" on this question between the Federal government and the City of Philadelphia, or the State of Pennsylvania.

If Congress had wished to cede to Philadelphia the sovereign power to tax all property, whether real estate or wages earned, on League Island, it could have done so by an Act plainly stating that fact, and the City of Philadelphia, *if duly authorized to do so by the State of Pennsylvania,* could have formally accepted the grant of such sovereign power. There has been no such "arrangement" here between the respective State and Federal governments. We do not even know whether the State of Pennsylvania would authorize the City of Philadelphia to accept any such grant of sovereign power (i. e. the power of taxation) from the Federal government. There might be reasons of sound public policy why Pennsylvania would refuse any such cession from the Federal government of sovereign power over land it had ceded at an earlier date to that Federal government.

The case of *Superior Bath Co. v. McCarroll,* 312 U. S. 176, 178 (cited in the majority opinion) is easily distinguishable from the case at bar. In that case, the facts were that Arkansas in 1903 ceded to the United States exclusive jurisdiction over the business area of the Hot Springs reservation, "reserving only the right to tax accorded in the 1891 Act [of Congress] and the right to serve criminal and civil process." The United

States Supreme Court said (p. 177) : "Whether appellant is subject to the state tax depends on the interpretation of the language of a provision of a Congressional Act of 1891 and the corresponding provision of an Arkansas Act of 1903."

The City of Philadelphia as a part of Pennsylvania should *not* invite the Federal Congress to "give it" power to tax persons and property clearly outside the jurisdiction of Philadelphia or of Pennsylvania. To solicit the grant of any such power from Congress is to put the State in the rôle of a suppliant and is in derogation of its dignity and its sovereignty. Many observers think that the impairment of the sovereign powers of the States has already gone to lengths that are inimical to the delicate and proper balacing of the respective powers of the National and the state governments.[5] If the Federal government grants to Pennsylvania or to one of its subdivisions the sovereign power to tax the property (wages) of a New Jersey citizen employed on League Island on Federal governmental work, thereby increasing (in the long run) the cost of that work, it can easily recoup itself by increasing the income taxes laid on citizens of Pennsylvania, of Philadelphia and of every other State in the Union. For every dollar Philadelphia may gain by this tax on wages earned by New Jersey citizens on League Island, its citizens will probably pay several dollars in increased Federal taxation.

States or nations do not tax individuals or property out of reach of their sovereign power. Where a man

---

[5] President Andrew Jackson in his Farewell Address said : "There have always been those who wish to enlarge the powers of the General Government. Its authority is sufficient for all the purposes for which it was created; these powers are enumerated and every attempt to exercise power beyond those limits should be firmly opposed. For one evil example will lead to other measures still more mischievous, and if . . . supposed advantages or temporary circumstances shall ever be permitted to justify the assumption of a power not given by the Constitution, the General Government will before long absorb all the powers of legislation and we will have one consolidated Government."

resides, *there he* is subject to taxation. Where his property is, *there it* is subject to taxation, and "Legal protection and taxation are reciprocal": *Glen Alden Coal Co. v. Commissioners*, 345 Pa. 159, 179, 27 A. 2d 239. For the tax Philadelphia seeks to impose on this plaintiff neither he nor his property receives any reciprocal protection. He owes Philadelphia no economic allegiance.

This tax is also an example of "taxation without representation", a principle which should still command some respect in this country, even though there are some conspicuous examples of its violation by the Federal government. Here plaintiff does not reside in Philadelphia and has no property there, and while property can always be taxed by the sovereignty which protects it, it is an anomaly in government for a State or city to attempt to tax a *non*-resident of that State or city on property *not* situated in that State or city. I do not believe that Public Act No. 819 was intended by Congress to create any such absurd situation. Certainly its language does not require the judicially sponsored birth of any such bizarre governmental innovation.

The decision of the United States Supreme Court in *Graves v. New York ex rel. O'Keefe*, 306 U. S. 466 (cited in the majority opinion) has *not the slightest bearing on this case*. That decision destroyed the previously enjoyed constitutional correlative immunity from income taxation of the salaries of officers or employees of national and state governments. That immunity had been based on the postulate that for one sovereignty to tax the salaries of the officials of another sovereignty was a tax on the instrumentalities of that sovereignty and therefore impliedly prohibited by the very nature of our constitutional system of dual sovereignties. See *Metcalf and Eddy v. Mitchell*, 269 U.S. 514. That doctrine long adhered to, has now been rejected by the United State Supreme Court,[6] and it followed that the salary

---

[6] See discussion in *Marson v. Phila.*, 342 Pa. 369, 372, 373, 21 A. 2d 228.

received, for example, by the Governor of Pennsylvania as an individual was subject to an income tax imposed by the Federal government, and it also followed that the salary received by the President of the United States, who resided in New York State, was subject to an income tax imposed by the State of New York, but it does not follow that the President or any other Federal official whose legal residence is *not* in Maryland could be taxed by Maryland on his salary or wages earned in the Federal area of the District of Columbia, which once belonged to and is now "located within the exterior boundary" of Maryland. The plaintiff being a *resident of New Jersey,* is not subject to the taxing jurisdiction of Philadelphia, neither are his wages *earned on League Island* subject to the taxing jurisdiction of Philadelphia. Therefore, Philadelphia has *no* jurisdiction to levy a wage tax on him.

It is my contention that Congress never conferred on Philadelphia jurisdiction to tax any New Jersey resident on his wages earned in the Federal area of League Island or in any other Federal area, and that if Congress should attempt to confer on Pennsylvania any sovereign power over League Island, such a transfer would not be effective until the state of Pennsylvania by a legislative act consented to accept it, just as the United States by a formal act of Congress on February 18, 1867, 14 U. S. St. at L. C 46 p. 396., accepted sovereignty over League Island after Pennsylvania by its act of February 10, 1803, supra, and later acts, ceded to the U. S. state sovereignty over League Island (with a minor reservation as to the service of process). Pennsylvania can obtain the power to tax persons or property on League Island, only from the United States, and Philadelphia can obtain its power to tax *anywhere,* only from Pennsylvania.

We said in *Passenger Ry. Co. v. Pittsburgh,* 226 Pa. 419, 75 A. 662: "There is no such thing as taxation by implication . . . taxation is a sovereign state governmental power not possessed by municipalities or mu-

nicipal divisions unless delegated to them". Cooley on taxation, fourth edition, Vol. 1, sec. 125 says: "The municipal corporation of a state having no inherent power to tax must take such power as is conferred under the conditions and limitations that may be prescribed, and only for such positions as may be expressed".

The majority opinion cites *Mason Co. v. Tax Comm'n,* 302 U. S. 186, 207, as authority for the proposition that "acceptance [of the transfer of sovereign power] will be presumed in the absence of a contrary intent." That phrase as used in that opinion was *dictum,* for in that very case the United States Supreme Court found that the Federal government had *not* assumed "an exclusive legislative authority which it did not need." In the same opinion the United States Supreme Court said that such a transfer of jurisdiction "rests upon a grant . . . and the grant may be accepted or declined." In the instant case there *was* no grant to Pennsylvania (or to Philadelphia) of any sovereign power or jurisdiction to tax persons or property on League Island. Congress simply declared in Public Act No. 819 that in those cases where a person was liable for any income tax levied by any state or any taxing authority therein, "having jurisdiction to levy such a tax", he should not be relieved from that liability "by reason of his residing within a Federal area or receiving income from transactions occurring on services performed in such area". Philadelphia is under Act No. 819 obliged to show its *possession of jurisdiction* over this taxpayer, i. e., its jurisdiction to "levy *such a tax on this person's income",* before it can say to him: "You are not relieved of liability from our city income tax by reason of the fact that you receive your income for services performed in the Federal area of League Island". New Jersey could legally say that to this taxpayer for New Jersey *has* jurisdiction over him; and the United States can legally say to him: "We can tax your income from services performed on League Island because *we are sovereign there".* But no grant of sovereign power over persons or incomes on League Island,

by the United States *to* Pennsylvania, nor the acceptance of any such grant of power *by* Pennsylvania can be found anywhere in this record. If Pennsylvania does not possess such jurisdiction over League Island, it follows that its statutory creature, the city of Philadelphia, possesses no jurisdiction.[7]

The United States still retains over League Island *all* the sovereign power which exclusively accompanied the formally accepted cession of this area to the United States in 1868. The City of Philadelphia has *no* jurisdiction *over persons or things on League Island.* Its official power *ends* when it reaches the Island's *borders* (except the retained power of serving process). I repeat: Philadelphia has no more power under Public Act No. 819 or under any other Federal Act, to tax a citizen of New Jersey on his salary or his wages earned on League Island than Maryland has to tax a resident of Virginia or of New York or of any other state on his salary or wages earned in the District of Columbia, which is a Federal area "located within the exterior boundaries" of Maryland, exactly as League Island is a Federal area "located within the exterior boundaries" of Pennsylvania.

I would give to the plaintiff the relief which he asks for and to which I think he is clearly entitled.

Mr. Justice PATTERSON joins in this dissent.

---

[7] The following three declarations of the U. S. Supreme Court are applicable here: From *Frick v. Pennsylvania*, 268 U. S. 473, 489: "It is also essential to the validity of a tax that the property shall be within the territorial jurisdiction of the taxing power. Not only is the operation of state laws limited to persons and property within the boundaries of the State, but property which is wholly and exclusively within the jurisdiction of another State, receives none of the protection for which the tax is supposed to be the compensation." From the *Foreign-held Bond case,* 15 Wall. 300, 319: "The power of taxation, however vast in its character and searching in its extent, is necessarily limited to subjects within the jurisdiction of the State. These subjects are persons, property, and business". From *Wachovia Trust Co. v. Doughton*, 272 U. S. 564, 575: "A state may not subject to taxation things wholly beyond her jurisdiction or control".